Arlene A. EATHORNE

v.

**WESTMORELAND COUNTY TAX CLAIM BUREAU and E.D. Lewis.**

**Appeal of E.D. Lewis.**

Commonwealth Court of Pennsylvania.

Argued Oct. 7, 2003.

Decided Feb. 19, 2004.

Reargument En Banc Denied April 21, 2004.

David E. Holland, Erie, for appellant.

Aaron M. Kress, New Kensington, for appellee.

BEFORE: PELLEGRINI, Judge, COHN, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge COHN.

Before the Court is an unusual situation where an owner/occupant of property, who

received and acted upon actual written notice of delinquent taxes although she had not received personal service of notice, received an agreement to stay the sale of the property after paying 25% of the amount due pursuant to Section 603 of the Real Estate Tax Sale Law, Act of July 7, 1947, P.L. 1368, *as amended,* 72 P.S. § 5860.603. However, the agreement was never executed, and the property was sold at tax sale without any additional notice. The trial court vacated the sale on the basis of improper notice and we are asked to review that decision.

The property at issue in this tax sale case was owned and occupied by Arlene A. Eathorne (Appellee). The tax sale arose due to Appellee's failure to pay her real estate taxes on the subject property for the years 1999 and 2000. Prior to the tax sale, the Westmoreland County Tax Claim Bureau (Bureau) issued several notices informing Appellee of her delinquency and of the Bureau's intent to proceed with a tax claim sale.

The Bureau sent the first notice in April 2000, via certified mail. Appellee signed the certified mail receipt, indicating that she received this notice. This first notice indicated that Appellee was delinquent in her taxes and that a tax sale could be instituted against her property to recover the amounts owed.

The Bureau sent a Notice of Public Sale in May 2001, via certified mail. The notice indicated that Appellee owed $3,971.27 in back taxes, and that her property would be sold on September 10, 2001, if she failed to pay these taxes. Appellee signed the certified mail receipt on May 12, 2001.

On July 13, 2001, the Bureau had the sheriff post the property with a notice of the sale. The notice contained the following language: "The sale of this property may, at the option of the Bureau, be stayed if the owner thereof or any lien creditors of owner, on or before the sale date, enters into an agreement with the BUREAU to pay the taxes and costs owing on said property in manner provided by said law." As with the prior mailed notice, this posted notice indicated that, in the absence of her payment of these taxes, the property would be sold on September 10, 2001. Appellee acknowledges receiving and reading this notice.

Within a few days of receiving the posted notice, Appellee telephoned the Bureau to inquire about entering an agreement. She was told by a Bureau employee that she had to pay a minimum of 25% of the amount due, as a down payment, to save her home from the sale and that she would be required to pay the balance on a monthly installment basis for a period of one year.

Appellee obtained a certified check in the amount of $1092.03, which was 25% of the amount due. On July 23, 2001, the Appellee went to the Bureau office with the certified check. Upon receiving the check, a Bureau clerk asked Appellee if she wanted to enter an agreement for the payment of her taxes. Appellee answered affirmatively. The Bureau employee then printed an agreement from the computer.

The clerk provided Appellee with a copy of the agreement and with a receipt of payment. The agreement provided that "upon payment of the [taxpayer] to the Tax Claim Bureau of the amounts hereinafter set forth, on or before the date set out opposite each, *sale shall be stayed* . . . ." (Emphasis added). The first payment amount listed was for $1,092.03, with a date due of 7/23/2001. The agreement also indicated that "in the case of default" the Bureau could proceed with the sale in accordance with the law, *but only* after providing the taxpayer with "written notice of such default given by United States

mail, postage prepaid." The receipt of payment, dated 7/23/2001, indicated that her payment of $1092.03 represented a "25% DOWNPAYMENT ON AGREEMENT" (Receipt from July 23, 2001)(italicized emphasis added).

The clerk at the filing office began explaining the terms of repayment to Appellee, noting that 9% interest would be applied to the balance up front, and that interest would be owed even if the installments were paid early. Appellee indicated that she was offended at having to pay interest and that she refused to pay it. She asked to have the agreement "reversed." The clerk indicated that she was not sure if she could do that and that her supervisor, who would be able to provide an answer, was out of the office that day. She indicated that she would check with her supervisor the next day and would call Appellee with the answer.

The next day, the Bureau clerk discussed the situation with her supervisor, resulting in the supervisor reversing the agreement. The Bureau employee telephoned Appellee that day to inform her that the agreement had been reversed, and that the balance on the taxes would have to be paid by the end of the month. Additionally, on that same date, the Bureau sent Appellee a revised Tax Claim Receipt, which was identical to the prior tax payment receipt she had received, except that it read, "PARTIAL PAYMENT ON 1999 TAXES" instead of "25% DOWNPAYMENT ON AGREEMENT." Appellee acknowledges receiving this revised receipt.

After July 23, Appellee made no further payments on the taxes owed.[1] Because she did not pay the balance of the taxes, the property was sold on September 10, 2001. Appellee challenged the sale and the trial court set it aside, concluding that the Bureau erred in failing to personally serve notice on Appellee.

 E.D. Lewis (Appellant), the purchaser of the property, who had intervened below, appeals from the trial court's order, arguing that the tax upset sale should not have been set aside on the basis that the Bureau had not made personal service of the tax sale notice on Appellee. In her response, Appellee asserts, first, that the trial court was correct in finding that notice was not properly served and additionally asserts, in the alternative, that the tax claim sale was invalid because the Bureau accepted the 25% down payment but, thereafter, failed to give Appellee adequate notice that the agreement to stay was null and void. We address this latter issue first.[2]

Appellee argues that, once she paid 25% of the amount owed as a down payment, she reasonably expected that the sale of her home would be stayed and that the Bureau was required to provide written notice before selling it in accordance with Section 603 of the Real Estate Tax Sale Law.[3] Appellant does not address this argument.

---

1. Subsequently, she explained her failure to pay the August installment because she was waiting to receive a coupon book. Nothing in the testimony of any of the witnesses indicates that anyone told her she would be receiving a coupon book.

2. The validity of a tax claim sale is a question of law and, as such, the scope of review is plenary. *American Appliance v. E.W. Real Estate Management, Inc.*, 564 Pa. 473, 477,

769 A.2d 444, 446 (2001). On appeal from a final decree, the standard of review is whether the trial court, in entering the decree, abused its discretion or committed an error of law. *Hysong v. Lewicki*, 811 A.2d 46, 49 n. 1 (Pa.Cmwlth.2002).

3. Section 603 pertinently states:

Any owner or lien creditor of the owner may, at the option of the bureau, prior to

Section 603 sets forth a procedure whereby the Bureau may choose to enter into agreements with delinquent tax payers to stay the sale of their property. Although a tax bureau is not required to enter into such an agreement, if it does choose to do so, it must comply with the general requirements of Section 603. This Section provides that the taxpayer must make an initial 25% down payment, followed by payments at regular intervals, resulting in full payment within one year of the agreement. In the event of default, this Section requires the Bureau to issue a notice of default, followed, thereafter, by a 90–day period during which time the property cannot not be sold.

■ In the instant case, the County had procedures for entering into agreements with taxpayers as to the payment of delinquent taxes. It is in large part because of these procedures that this case is before us. At first, Appellee indicated her assent to entering the agreement; however, after she tendered her payment and the agreement was printed and given to her, she wanted to change her mind. At that time, she was told, essentially, that she could not change her mind and that the agreement was already in effect. Of particular importance for the resolution of this case, upon her payment of 25% of taxes owed, the Bureau provided her with *written documentation* that supported her understanding that the agreement was in effect and that, therefore, ***the sale of her house was stayed.***[4] The clear language of this agreement indicated that the stay would only be lifted following delivery by first class postage of a written notice of default.

■ Although the Bureau did contact Appellee by telephone the following day, informing her that it had "reversed" the agreement, the Bureau provided no written notice explicitly indicating that this had been done.[5] We are mindful that, in evaluating whether notice requirements as to tax sales have been strictly complied with, our *"inquiry is not to be focused on the neglect of the owner,* which is often present in some degree, *but on* whether the *activities of the Bureau* comply with

the actual sale ... enter into an agreement, in writing, with the bureau to stay the sale of the property upon the payment of twenty-five per centum (25%) of the amount due on all tax claims and tax judgments filed or entered against such property and the interest and costs on the taxes returned to date, as provided by this act.... But in case of default in such agreement by the owner or lien creditor, the bureau, after written notice of such default given by United States mail, postage prepaid, to the owner or lien creditor at the address stated in the agreement, shall apply all payments made against the oldest delinquent taxes and costs, then against the more recent. If sufficient payment has been made to discharge all the taxes and claims which would have caused the property to be put up for sale, the property may not be sold. If sufficient payment has not been received to discharge these taxes and claims, the bureau shall proceed with the sale of such property in the manner herein provided either at the next scheduled upset sale or at a special upset sale, either of which is to be held at least ninety (90) days after such default. If a party to an instalment [sic] agreement defaults on the agreement, the bureau shall not enter into a new instalment [sic] agreement with that person within three (3) years of the default.

72 P.S. § 5860.603.

4. The printed agreement Appellee received listed the monthly amounts that were owed for the twelve-month period of the agreement, identifying the first amount of $1092.03 as being due on 7/23/01. The printed receipt she received indicated that her payment of $1092.03 represented a 25% down payment on *an agreement.*

5. The Bureau did forward a revised receipt that removed the words agreement; however, nothing in this notice indicated that the agreement itself was not effective or that the tax sale was not stayed.

the requirements of the statute." *Return of Tax Sale by Indiana County Tax Claim Bureau v. Clawson*, 39 Pa.Cmwlth. 492, 395 A.2d 703, 706 (1979) (emphasis added). The statutory law repeatedly stresses the importance of providing written notice prior to the sale of one's home, and we find this principle applicable in this unique situation.

Therefore, we hold that, after accepting her down payment and providing her with an agreement, the Bureau should have complied with Section 603 and provided written notice to Appellee prior to proceeding with the sale. Had it done so, she would have been informed of the Bureau's intention of continuing with the sale.[6]

We, therefore, hold that the sale of the property proceeded with inadequate notice to the property holder and, as such, the sale must be vacated.[7] Accordingly, the decision of the common pleas court is affirmed in part and reversed in part.

### ORDER

**NOW**, February 19, 2004, the final decree of the Court of Common Pleas of Westmoreland County in the above-captioned matter is hereby reversed to the extent that it conditions setting aside the tax claim sale on payment of taxes owed within 30 days, and affirmed to the extent

that it ordered the tax claim sale to be set aside.

### DISSENTING OPINION BY Judge PELLEGRINI.

I respectfully dissent from the majority decision that Arlene A. Eathorne (Eathorne) did not have actual notice that her property would be sold at a tax sale if she did not pay her taxes for years 1999 and 2000 which were in arrears.

After receiving notices from the Westmoreland County Tax Claim Bureau (Bureau) in April 2000 and May 2001 via certified mail that back taxes were owed and her property would be sold on September 10, 2001, if they were not paid, and having notice of the pending sale posted on her property on July 13, 2001, Eathorne called the Bureau to inquire about entering into an agreement with it to stay the sale. She was told that she had to pay a minimum of 25% of the amount owed with monthly payments to follow. She went to the Bureau office on July 23, 2001, with a check for 25% of the taxes that were due, and was provided with an agreement and a receipt of payment. After learning that she would also be expected to pay 9% interest, Eathorne asked to have the agreement abrogated. The following day, the Bureau called her to inform her that

---

6. Because we find that the Bureau's failure to provide written notice to an owner/ occupant following the events of July 25th provides sufficient basis on its own to insolubly taint the tax sale, we need not address Appellant's argument that actual notice of the sale cures the Bureau's failure to provide personal service to an owner/occupant as required by Section 601(a)(3) of the Real Estate Tax Sale Law, 72 P.S. § 5860.601(a)(3) (providing that "No owner-occupied property may be sold unless the bureau has given the owner occupant written notice of such sale at least ten (10) days prior to the date of actual sale by personal service . . . .")

7. The trial court's final decree provided that "the tax sale of plaintiff's real estate on September 10, 2001, is set aside, and the Westmoreland County Tax Claim Bureau is directed to refund the amount paid as a result of the sale to the intervenor, E.D. Lewis, all of which is conditioned upon the plaintiff paying all amounts due relative to the 1999, 2000, and 2001 real estate taxes within the next thirty (30) days." (Trial Court Final Decree). We reverse the trial court decree to the extent it conditions setting aside the tax sale on Eathorne's payment of the delinquent taxes, but affirm the trial court decision that the tax sale is set aside.

the agreement had been abrogated and that the balance on the taxes were due by the end of the month. Because no further payments were made by Eathorne, the property was sold at a tax sale on September 10, 2001.

Eathorne challenged the sale, and the trial court set it aside after holding that pursuant to Section 601(a)(3) of the Real Estate Tax Sale Law,[1] even though Eathorne had actual notice, the Bureau failed to properly serve written notice on Eathorne, the owner-occupant of the property in question, within ten days prior to the sale that a sale was to take place of her property. E.D. Lewis (Lewis), the purchaser of the property, appeals from the trial court's decision arguing that the sale should not have been set aside. Eathorne argues that the sale was invalid because the Bureau accepted the 25% payment, but failed to give her adequate notice that the agreement was null and void.

The majority affirms the trial court, but not on the basis that she did not have sufficient notice under Section 601(a)(3), but instead, relying upon Section 603 of the Real Estate Tax Sale Law,[2] pertaining to an agreement to stay the sale of property. It holds that that provision required the Bureau to inform Eathorne that because she had made a 25% payment and then changed her mind regarding the agreement but was not informed by the Bureau in writing that the agreement had been "reversed," that there was a 90–day period during which the property could not be sold, but, thereafter, it could. Because the Bureau provided no such written notice to Eathorne, the majority finds in her favor.

I disagree with the majority because once Eathorne advised the Bureau that she wanted the agreement abrogated which the Bureau acceded, Section 603 of the Real Estate Tax Sale Law had no application to this case because there was no default of the agreement because there was no agreement to default, and the Bureau was not required to send her any

1. Act of July 7, 1947, P.L. 1368, *as amended,* 72 P.S. § 5860.601(a)(3). That section provides in relevant part:

 NO owner-occupied property may be sold unless the bureau has given the owner occupant written notice of such sale at least ten (10) days prior to the date of actual sale by personal service by the sheriff or his deputy or person deputized by the sheriff for this purpose unless the county commissioners, by resolution, appoint a person or persons to make all personal services required by this clause.

2. 72 P.S. § 5860.603. That section provides:

 Any owner or lien creditor of the owner may, at the option of the bureau, prior to the actual sale ... enter into an agreement, in writing, with the bureau to stay the sale of the property upon the payment of twenty-five per centum (25%) of the amount due on all tax claims and judgments filed or entered against such property and the interest and costs on the taxes returned to date, as provided by this act ... But in case of default in such agreement by the owner or lien creditor, the bureau, after written notice of such default given by the United States mail, postage prepaid, to the owner or lien creditor at the address stated in the agreement, shall apply all payments made against the oldest delinquent taxes and costs, then against the more recent. If sufficient payment has been made to discharge all the taxes and claims which would have caused the property to be put up for sale, the property may not be sold. If sufficient payment has not been received to discharge these taxes and claims, the bureau shall proceed with the sale of such property in the manner herein provided either at the next scheduled upset sale or at a special upset sale, either of which is to be held at least ninety (90) days after such default. IF a party to an installment [sic] agreement defaults on the agreement, the bureau shall not enter into a new installment [sic] agreement with that person within three (3) years of the default.

notice under that provision. In fact, Eathorne did not require any such notice because she was fully aware that she still had taxes in arrears that were owed, plus interest, and she had not paid those taxes and penalties. Once the Bureau agreed to the rescinded agreement, what possibly could Eathorne have thought would happen to the property but a tax sale, of which she had actual notice.

Accordingly, for these reasons, I dissent.